UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

№ 06-CV-5890 (JFB) (ETB)
_____

JAG M. KALRA,

Plaintiff,

VERSUS

HSBC BANK USA, N.A.,

Defendant.
_____

MEMORANDUM AND ORDER
July 25, 2008
_____

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Jag Kalra ("Kalra" or "plaintiff") brings this action alleging employment discrimination in violation of the Federal Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq*. ("ADEA") against defendant HSBC Bank USA, National Association ("HSBC" or "defendant" or "Bank"). Specifically, plaintiff alleges that defendant discriminated against plaintiff by terminating him because of his age.

On February 12, 2008, defendant moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, defendant's motion for summary judgment is granted in its entirety. The undisputed evidence demonstrates that HSBC hired plaintiff at the age of 65 as a Consumer Banker at the new Rockville Centre Branch and that, after over three months on the job and extensive training, there were numerous complaints regarding his inability to perform his job. For example, HSBC has submitted affidavits from three different HSBC managers, all of whom worked with plaintiff at different times at separate locations during his brief employment, which describe in detail incidents regarding plaintiff's inability to perform the functions of the job in a satisfactory manner, including significant errors in interactions with customers, and the managers' unsuccessful efforts to provide plaintiff with additional training and coaching to avoid such errors. In his lengthy opposition to the motion, although plaintiff tries to dispute or explain some of these deficiencies in his performance, he does not dispute that the complaints were made or that certain incidents occurred. Moreover, he offers absolutely no evidence from which a rational trier of fact could conclude that the proffered reason for the termination – namely, his

inability to perform the job – was a pretext for age discrimination. Therefore, his ADEA claim cannot survive summary judgment.

I. BACKGROUND

A. Facts

The following facts are taken from the parties' depositions, declarations, exhibits and respective Local 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Thus, the Court shall construe the facts in favor of the plaintiff.

1. Plaintiff's Hiring & Training

Plaintiff was hired by HSBC on September 10, 2005 and began working for HSBC on September 26, 2005. (Def.'s 56.1 ¶ 2.)[1] Plaintiff was 65 years old at the time of his hiring. (Pl.'s Opp., at 1.) He was hired for the position of Consumer Banker at a new branch in Rockville Centre. (Def.'s 56.1 ¶ 3.) A Consumer Banker is a platform banker who sits on the floor of the bank and who is not licensed by FINRA (previously NASD) to sell non-depository products. (Lavelanet Aff. ¶ 5.)

Plaintiff attended a new hire orientation on September 26, 2005. From September 27, 2005 through October 3, 2005, plaintiff received on-the-job training at the Lynbrook Branch.[2] (Def.'s 56.1 ¶ 6.) From October 4, 2005 through October 14, 2005, plaintiff attended Platform Orientation training at the Melville Branch's training center.[3] (Def.'s 56.1 ¶ 8.) Plaintiff's Platform Orientation training course was taught by Mark Branca ("Branca"), and was conducted at HSBC's Melville, New York training center in a classroom. (Def.'s 56.1 ¶¶ 9, 11.) There were twelve individuals in plaintiff's Platform Orientation class. (Def.'s 56.1 ¶ 12.) Finally, plaintiff received on-the-job training on October 17, 2005 at the Hewlet Branch, from October 18, 2005 to October 19, 2005 at the Manhasset Branch, and from October 20, 2005 to October 27, 2005 at the Lynbrook Branch. (Def.'s 56.1 ¶¶ 13-15.)

On October 28, 2005, plaintiff reported to the Rockville Centre Branch. (Def.'s 56.1 ¶ 16.) The Rockville Centre Branch officially opened to the public on October 31, 2005. (Def.'s 56.1 ¶ 17.) Lavelanet became the

---

[1] Where only one party's 56.1 statement is cited, the fact is not contested by the other party or the other party has offered no evidence to controvert that fact. Similarly, where there is a citation to an affidavit or other document in the record, the fact is not in dispute unless otherwise noted.

[2] According to the Rockville Centre Branch Manager, Alexandra Lavelanet ("Lavelanet"), "[o]n-the-job training consists of having a new hire watch an experienced employee perform tasks and transactions and then have the new hire perform the same tasks and transactions with the assistance of the experienced employee." (Lavelanet Aff. ¶ 7.)

[3] Platform Orientation is a nine-day class for new hires that covers the following topics: (1) HSBC as an institution; (2) various software programs; (3) customer service; (4) sales process; (5) inputting, changing and updating client data; (6) how to maintain accounts; (7) KYC (know your customer) principles; (8) bank policies; (9) credit applications and the credit process; (10) information security; and (11) how to open personal and business accounts. (Branca Aff. ¶ 6.)

2

Branch Manager and Beatrice Deevy ("Deevy") became the Assistant Branch Manager.

2. Plaintiff's Job Performance

The articulated basis for plaintiff's termination was his alleged poor job performance over the course of his time at HSBC. The following evidence is contained in the record concerning the plaintiff's performance.

a. The Initial Incidents

Branca spent a week at the Rockville Centre Branch assisting the employees, spending time with each employee, and observing their work performance. (Branca Aff. ¶¶ 12-13.) According to Branca, plaintiff struggled more than the others (all of whom were new hires with the exception of the Assistant Branch Manager) and was unable to work without supervision and coaching. (*Id.* ¶¶ 14-15.)

Throughout his first month there, many supervisors observed plaintiff struggle in several ways. First, defendant provided evidence that plaintiff had repeated difficulty logging on to the system and remembering his passwords throughout his entire period with HSBC. (Lavelanet Aff. ¶ 15; Branca Aff. ¶ 14; Deevy Aff. ¶¶ 5-7.) Plaintiff does not dispute that he had password problems, but instead argues that he was not given a password between September 27 to October 27, 2007, and that his password situation was fixed by a security officer, Carmella Butt, on October 28, 2005. (Pl.'s Opp., at 2.) Plaintiff also argues that "[p]laintiff's name might have been black listed as a computer hacker who was trying to break into the HSBC Bank's computers and various other programs. It was for the security reasons that [he] 'had to reset his passwords all the time[.]'" (Pl.'s Resp. to Deevy Aff., at 2.)

Defendant also provided evidence that plaintiff was unable to perform basic banking functions on his own, including having difficulty opening the Bank vault. (Lavelanet Aff. ¶¶ 17-19; Deevy Aff. ¶ 4.) Plaintiff disputes that he was unable to open the vault. (Pl.'s Opp. to Deevy Aff., at 2.) Plaintiff does not dispute that he had difficulties on the job, but explains that, because of his password problems, he "did not get a chance to do hands-on training and practice to do various transaction with experienced bankers therefore Plaintiff was learning and practicing Banking transactions with the help from the notes (short cut) prepared during the training (reference cards)." (Pl.'s Resp. to Def.'s Rule 56.1, at 4.)

Moreover, defendant provided evidence that plaintiff's behavior was unprofessional. (Lavelanet Aff. ¶¶ 21-28.) For instance, Lavelanet recalls one instance during a staff meeting where plaintiff interrupted Lavelanet three times and announced to the group that it was illegal to make sales calls to customers on Veteran's Day as Lavelanet had directed. (Lavelanet Aff. ¶ 24.) Lavelanet also states that plaintiff refused to leave voicemail messages on his customers' answering machines after being instructed to do so by Lavelanet. (Lavelanet Aff. ¶ 26.) Plaintiff does not dispute that these disagreements occurred, but instead argues that his intentions were different than those represented by the defendant. For instance, plaintiff contends that "[a]ny such interruptions should have been an instructional issue rather than taking them personally as an act of insubordination

3

and instructional for the reasons of being counterproductive." (Pl.'s Resp. to Def.'s 56.1, at 3.)

### b. The IJD

On November 22, 2005, Lavelanet prepared an Employee Interim Job Discussion ("IJD") and delivered the IJD to plaintiff. (Lavelanet Aff. ¶ 30.) The IJD summarized plaintiff's shortfalls and advised plaintiff of the specific areas where plaintiff's performance and behavior required improvement. (*Id.* ¶ 30 & Exh. B.) On November 28, 2005, plaintiff provided Lavelanet with a written response to the IJD. (Lavelanet Aff. ¶ 32 & Exh. C.) The response conceded some of plaintiff's shortfalls, including his difficulty using the computers, opening the vault, and behavioral issues. (*Id.* at Exh. C.) Plaintiff stated,

> Before I give you any explanations to the warning letter that I received from you, I did not work on the Banking before as a banking officer and need lot of support and guidance.
>
> I have tried to give my best shot to do my job but as you kindly pointed out that I failed to the standards. If I get some directions from you, I will make every effort to improve my performance to your expected standards and I will take it as a challenge myself.

(Pl.'s Resp. to IJD, at 1; Defs.' Exh. C.) The following is a list of explanations plaintiff gave in his response. First, with respect to defendant's accusations of computer problems, plaintiff stated:

> [I]t was a poor call from the Management to assign me a job on the computer unless I had due training to handle the computers and the programs.
>
> It will be needless to mention that the Computer[] training is on hand practice and comes with practice over and over again. Some people are fast learners and other are slow learners. I am perhaps, a slow learner and need more on hand practice. . . . *I must confess here that I still need on hand training with the Computers* and in the beginning or 19 days of working it is difficult to learn all.

(*Id.* at 2-3) (emphasis added). Second, in response to defendant's contentions that plaintiff was sitting on the client's chair, plaintiff responded:

> I sat on the Client's chair once for 2/3 minutes when no one was in the branch . . . My manager told me not to sit there, I never sat there anymore and moreover there were [no] such directives given in this regards before.

(*Id.* at 4.) Plaintiff also described the above-listed incident regarding calling the contact list on a federal holiday:

4

> On the morning on Nov. 11, 2005 (a holiday for some people), as we opened the Branch, our Manager said that this is the best day to call people from the Contact List as every one will be home, if they are not home leave the message . . . Perhaps, it was my mistake to say that it is too early to call and the law does not permit calling before 10AM, on holidays, because that people might be resting. Perhaps it also my misunderstanding that leaving messages like over 2 times may be considered as harassment to the person called. Indirectly, I had the best interest of the Bank at my heart and idea was not to disobey my Manager.

(*Id.* at 4.) Finally, in his response to the IJD, plaintiff alleged that at some point after the IJD, he requested that his manager give him an example of a "tense moment" described in the IJD, and Lavelanet told him that Deevy did not like plaintiff's comment "You do not like me." (*Id.*) Plaintiff explained that, when Deevy forgot to give him three days off for the Thanksgiving Holiday, he approached her and said "you do not like and you forgot to give me 3 days off during the week" and was "laughing" when he said it. (*Id.*) Plaintiff argued that he "was not trying to hurt anyone's feelings." (*Id.*) Plaintiff then accused Lavelanet of being biased, stating "you decided to give me a 'written warning' and it appears that you are very much upset with me either for the reasons given in the 'warning letter' or you are being biased towards me for some reasons . . . I feel that I have been singled out for the reasons of discrimination, harassment, biased etc. of some kind." (*Id.* at 4-5.)

A meeting was then held between Lavelanet, plaintiff, and a representative from HSBC's Human Resources Department (the "Meeting"). (Lavelanet Aff. ¶ 37.) The parties agreed at the meeting that plaintiff would be sent to another branch for additional training that he requested. (*Id.* ¶¶ 39-40.)

Plaintiff spent two additional weeks of on-the-job training at the New Hyde Park Branch. (*Id.* ¶ 48.) His training manager there was Gerard Scansarole ("Scansarole"), the New Hyde Park Manager. At the conclusion of plaintiff's training, Scansarole sent an email on December 23, 2005 to John Grasso, the head of Nassau County retail banking, summarizing plaintiff's performance. The email mentioned, in relevant part:

> The consensus among the staff was that Jag did not do a satisfactory job while in the branch for the two weeks.
>
> It was observed that Jag still does not understand the system well . . . I feel that Jag needs constant assistance, coaching and supervision when opening new accounts as well as handling routine transactions.
>
> It was observed that Jag was giving customers misinformation about products and services, and opened incorrect accounts in a wrong customers [sic] name with

5

incorrect rates . . . During the week Jag processed some transfers for customers, and never finished the transaction . . .

***

At this point he is not, and I would not trust him to sit with customers to sell products and services correctly.

(Lavelanet Aff. Exh. D.)

### c. Additional Problems

Plaintiff provides no evidence to dispute that the following additional incidents occurred.

At some time in December (after the Meeting), plaintiff had an incident when opening a checking account for a customer. (Lavalanet Aff. ¶ 42.) He failed to enter the data correctly, and instead of opening the checking account for Customer A, opened it for Customer B. (*Id.*) As a result, Customer A signed the application which contained another customer's personal information. (*Id.* ¶¶ 43-44.) HSBC had to redo the entire transaction. (*Id.* ¶ 45.)

On January 6, 2006, plaintiff attempted to open a joint checking account for a married couple. (*Id.* ¶ 52.) After thirty minutes, plaintiff came to Lavelanet's office for help because he did not know how to open a joint account. (*Id.* ¶¶ 53-54.) Lavelanet showed plaintiff how to enter the data. (*Id.* ¶ 54.) Later, plaintiff again came into Lavelanet's office for help. (*Id.* ¶ 55.) Lavelanet had to ask a third person to assist and redo the entire process. (*Id.* ¶ 56.)

Plaintiff was terminated after this incident on January 6, 2006. (*Id.* ¶ 58.) On that same day, Lavelanet received an email from a banker at the New Hyde Park Branch advising her that while plaintiff had been working there, he ordered checks for a client but used the wrong account number. (*Id.* ¶ 60.) When the customer began using his checks, they were written against a line of credit, not a checking account, which resulted in the client incurring finance charges. (*Id.*)

The following day, Lavelanet reviewed the account documents for the customers whom plaintiff had serviced the day before. (*Id.* ¶ 61.) She also discovered that plaintiff ordered a debit card even though the clients wanted an ATM card. (*Id.*)

### 3. The Alleged Replacements

Plaintiff argues that the Court should infer discriminatory animus for the purpose of this motion because defendant replaced plaintiff with the following younger employees.

When the Rockville Centre Branch first opened, a position for Personal Banker was available. (Lavelanet Aff. ¶ 64.) A Personal Banker must possess insurance and securities licenses because the position requires the individual to sell non-depository products, unlike that of a Consumer Banker. (*Id.*)

Jennifer Watts ("Watts"), one of Lavelanet's former colleagues at Chase, applied for the Personal Banker position in November 2005 but turned down the offer. (Lavelanet Aff. ¶ 66.) She eventually took a

job with HSBC at its Hewlett Branch in June 2007. (*Id.*)

Indira Das ("Das"), another of Lavelanet's former Chase colleagues, applied for the Personal Banker position after Watts turned it down. (*Id.* ¶ 68.) She accepted the offer on December 16, 2005 (prior to plaintiff's termination), and began working for HSBC after plaintiff was terminated. (*Id.*)

B. Procedural History

On June 17, 2005, plaintiff filed a verified complaint with the New York State Division of Human Rights charging defendant with discrimination pursuant to the ADEA. Plaintiff received a "Right to Sue" letter, dated August 11, 2006.

Plaintiff initiated the instant action on October 31, 2006. On January 18, 2008, defendant moved for summary judgment. Plaintiff filed his opposition to defendant's motion on February 7, 2008. On February 12, 2008, defendant moved for a Protective Order Seeking the Return of Inadvertently Produced Attorney Client Communications within plaintiff's opposition papers. By order dated April 28, 2008, Magistrate Judge Boyle granted defendant's motion for a protective order with respect to the three privileged emails inadvertently produced to the *pro se* plaintiff and directed plaintiff to return all copies of the inadvertently produced documents in his possession to defendant within ten days of the date of the order. Plaintiff resubmitted his opposition papers on June 11, 2008.[4] Defendant submitted a reply on June 23, 2008.

II. Standard of Review

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding summary judgment unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

---

[4] Although defendant indicates that plaintiff continues to reference these privileged emails in his opposition papers (*see* Def.'s Reply, at 2 n.1), none of these materials submitted by plaintiff impact the Court's decision with respect to the summary judgment motion for the reasons discussed *infra*.

7

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *Tufariello v. Long Island R.R.*, 364 F. Supp. 2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g. Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

### III. Discussion

A. Age Discrimination Under ADEA

Plaintiff alleges discrimination under the ADEA based on his age in connection with his termination by HSBC in January 2006. Specifically, plaintiff alleges that he "was treated discriminatory [sic] and differently because of his age of 65 because all other employees were younger to [sic] the Plaintiff." (Pl.'s Opp., at 2.) As set forth below, HSBC has demonstrated that it is entitled to summary judgment on this claim because no reasonable

8

jury could find age discrimination based on the record in this case.

### 1. Legal Standard

The ADEA states that it is "unlawful for an employer . . . to discharge an individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1) (2006). Because plaintiff presents no direct evidence of discriminatory treatment based on his age, the Court reviews his ADEA claim under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *See D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193, 194 (2d Cir. 2007); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).

To establish a *prima facie* case of age discrimination, a plaintiff must demonstrate that: "(i) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination, such as the fact that the plaintiff was replaced by someone 'substantially younger.'" *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996)). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis." *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

Once a plaintiff establishes a *prima facie* case of discrimination, "the burden of production [shifts] to the defendant, who must proffer a 'legitimate, non-discriminatory reason' for the challenged employment action." *Woodman*, 411 F.3d at 76 (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001)). If the defendant articulates a legitimate, non-discriminatory reason, plaintiff must then prove that defendant's articulated reasons are pretextual. *See id.* at 76. "In short, the ultimate burden rests with the plaintiff to offer evidence 'sufficient to support a reasonable inference that prohibited [age] discrimination occurred.'" *Id.* (citing *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000)).

To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). However, meeting "*McDonnell Douglas*'s minimal requirements of a *prima facie* case plus evidence from which a factfinder could find that the employer's explanation was false" does not automatically and necessarily require the denial of summary judgment and the submission of the case to the jury. *James*, 233 F.3d at 157. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.; Connell v. Consol. Edison Co. of N.Y., Inc.*, 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000).

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is

9

sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove – particularly discrimination." 233 F.3d at 157; *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

## 2. Application

The Court assumes, for the purposes of this motion, that plaintiff has made out the *prima facie* case required by *McDonnell Douglas*. In response, defendant has established a legitimate non-discriminatory reason for his dismissal, namely, plaintiff's alleged failure to perform his job adequately during his time at HSBC. Hence, the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find age discrimination by examining each party's evidence individually and then proceeding to evaluate the evidence as a whole. *See Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir. 1997); *Tomney v. Int'l Ctr. for the Disabled*, 357 F. Supp. 2d 721, 742 (S.D.N.Y. 2005); *see also Siano v. Haber*, 40 F. Supp. 2d 516, 520 (S.D.N.Y. 1999), *aff'd mem.*, 201 F.3d 432 (2d Cir. 1999); *Lapsley v. Columbia Univ. – Coll. Of Physicians & Surgeons*, 999 F. Supp. 506, 515 (S.D.N.Y. 1998).

In support of its position that plaintiff was fired due to his failure to perform his job adequately, defendant points to several pieces of evidence to show plaintiff's need for constant supervision in performing basic bank functions. First, Lavelanet and Deevy assert that plaintiff had repeated problems using the Bank's computer systems and constantly needed to reset his passwords because he forgot them. (Lavelanet Aff. ¶¶ 14-16; Deevy Aff. ¶¶ 5-7.) They also contend that plaintiff had repeated difficulties opening the Bank vault. (Lavelanet Aff. ¶¶ 17-18; Deevy Aff. ¶ 4.) On a particular instance, Lavelenet recalls that plaintiff failed to verify the currency in the vault as counted by the teller despite having been instructed to do so, and then denied being told to do so. (Lavelanet Aff. ¶ 20.) Furthermore, they point to three separate incidents, discussed above, where plaintiff made significant transactional errors that put customers at risk, including: (1) plaintiff processing a credit card application and checking account application for two different customers and switching their personal data, which required HSBC to reverse all of the transaction and re-perform the work; (2) plaintiff's inability to open a retail joint account, which had to be re-done and resulted in complaints by the customer; and (3) plaintiff ordering the wrong checks for a client, causing the client to incur finance charges and forcing HSBC to reverse all the transactions. (Lavelanet Aff. ¶¶ 41-45, 52-56; Exh. E.) Defendant points to evidence that, in response to these various performance problems, HSBC provided plaintiff with additional training, but the plaintiff's performance did not improve. In fact, defendant calculates, based upon the undisputed evidence in the record, that "[o]f the 73 business days Plaintiff worked for HSBC, 33 of them – or nearly half – were spent receiving either on-the-job training or formal classroom training." (Def.'s Mem. of Law, at 2.)

Plaintiff makes a futile attempt to try to undermine these articulated, non-discriminatory grounds for termination or to create factual issues regarding these grounds.

For instance, plaintiff argues the following: (1) the issues raised by Lavelanet in the IJD were false; and (2) he was picked on because of his age. However, rather than dispute that most of these complaints or incidents occurred, plaintiff merely provides explanations for his failure to perform his job satisfactorily (similar to those arguments raised in his response to the IJD) or tries to minimize the significance of the incident. For instance, with respect to issues with passwords, plaintiff argues that he was not given a password between September 27 to October 27, 2007, and that his password situation was fixed by a security officer, Carmella Butt, on October 28, 2005. (Pl.'s Opp., at 2.) He further contends that "[p]laintiff had no problems with computers once the issues with the Pass Words were fixed . . ." (*Id.* at 7.)[5] With respect to the issues relating to opening the vault, plaintiff argues that it was "an instructional issue" and that "[t]here was no formal training for counting vault money . . . and it is the Branch Manager's responsibility to explain the details . . . and Ms. Alex failed in her duties to give proper instructions." (*Id.* at 5.) The same types of explanations for these complaints about his performance are prevalent throughout plaintiff's lengthy submissions.[6]

However, none of these arguments or explanations can overcome the overwhelming and undisputed evidence supporting the legitimate non-discriminatory reason for the termination, not only including the technical problems listed above, but also the behavioral issues complained about by management. For instance, Lavelanet complained that plaintiff repeatedly interrupted her at a staff meeting because he felt that she was instructing the staff to make illegal phone calls, and was dismissive to her during a staff meeting. (Lavelanet Aff. ¶ 24.) She further stated that plaintiff needed to be instructed how to sit properly when at his desk (*id.* ¶ 28), and that he refused to leave voicemail messages with customers after being told to do so by his manager because he believed the messages required approval from the legal department (*id.* ¶ 26). Moreover, defendant provided evidence of an incident where plaintiff told Deevy that she "didn't like him" because she mistakenly scheduled him to work on a

---

[5] Although defendant refers to plaintiff's Exhibit 13 in arguing that the password problems continued until his termination, the Court takes the evidence in a light most favorable to the plaintiff at the motion for summary judgment stage. However, even assuming *arguendo* that plaintiff has demonstrated factual issues regarding passwords, the password issue was not the sole basis for plaintiff's termination. The record is clear that plaintiff's performance and behavioral issues went well beyond password problems, as discussed in more depth below. Moreover, there is not a scintilla of evidence from which a jury could infer that plaintiff was terminated because of his age.

[6] The Court also notes that plaintiff states in his deposition that his response to the IJD was not true because he wrote it to "create good rapport." (*See* Kalra Dep., at 88.) However, that effort to distance himself from certain concessions in his response to the IJD is conclusory and unsupported by the rest of his deposition and supporting papers, where he either agrees that the particular events occurred, (*e.g.,* "There is nothing untrue. Everything is true here.") (*id.* at 89), or provides excuses for such behavior, as discussed throughout this Memorandum and Order. Thus, to the extent that plaintiff is attempting to use his deposition to create factual issues by denying admissions he made in his response to the IJD and elsewhere, the Court finds plaintiff's position to be unavailing and insufficient to overcome summary judgment in light of the entire record.

planned day off. (Deevy Aff. ¶¶ 8-9.) For each of these incidents, plaintiff does not dispute that they occurred, but provides further explanations for his behavior.[7]

Not only has plaintiff failed to undermine in any way the strength of HSBC's articulated, non-discriminatory reason for the termination, he has failed to offer any evidence whatsoever to suggest that age had any role in plaintiff's employment or termination. Plaintiff either does not dispute or provides no evidence to contradict the evidence offered by defendant and, instead, relies solely on his own conclusory statements in an attempt to create genuine issues of fact for trial. For instance, plaintiff argues that his "performance on computer is an unverifiable and undocumented defense extended by Defendant to meet the thresholds of Plaintiff's wrongful termination because Defendant[] w[as] hostile and retaliatory because of Plaintiff's allegation of Age discrimination, being biased, Plaintiff was singled out because of his age, was being harassed etc." (Pl.'s Resp. to Def.'s 56.1, at 7.)

In a motion for summary judgment, the nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the adverse party's pleading." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (internal quotation marks and citation omitted). Here, plaintiff's allegations of discrimination relating to his termination are based solely on the above-referenced conclusory statements and personal beliefs. *See Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996) (holding assertion of personal beliefs insufficient to show pretext), *cert. denied*, 520 U.S. 1228 (1997). Furthermore, "factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). Plaintiff has not presented any direct or circumstantial evidence from which a reasonable fact-finder could infer a causal relationship between the plaintiff's age and his termination.[8]

---

[7] The Court notes a few of the many examples of explanations plaintiff provides for this behavior in his opposition papers. For instance, with respect to the phone call incident, plaintiff said that he "was trying to save the reputation of the Bank to make calls at 9[:]30 AM and wanted some delay as people might be sleeping and/or having Break Fast [sic] with their families on the Holiday." (Pl.'s Resp. to Lavelanet Aff. ¶ 24.) Similarly, with respect to leaving voicemail messages, plaintiff contends that "leaving 5 messages on the Answering Machines in 2 weeks, might be considered as 'harassment' by the client my intentions were to save the reputation of the Bank." (*Id.* ¶ 26.)

[8] Plaintiff refers to a chain of emails throughout his opposition papers, which he attached as exhibits, to show discriminatory animus. However, the emails clearly demonstrate an ongoing discussion within management regarding the best way to deal with the performance problems they were having with plaintiff, and the opportunity to afford him additional training. In fact, they corroborate the deposition testimony and affidavits of the defendant's employees – highlighting and documenting plaintiff's performance difficulties and problematic behavior. Although plaintiff argues that discussions about concerns about being sued and the decision to give him additional training demonstrate discriminatory animus, those discussions – both in isolation and in the context of the entire record – do not provide a reasonable inference of age discrimination.

Plaintiff contends that Lavelanet's comments about his performance and behavior, specifically in relation to the negative IJD evaluation, amounted to "picking on him" because of his age, thereby evidencing the discriminatory nature of plaintiff's termination. As a threshold matter, the Court finds these conclusory allegations regarding his negative evaluation – which were wholly unrelated to plaintiff's age – to be insufficient to create a genuine issue of disputed fact. Moreover, it is well settled that the mere fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination. *See, e.g., McLee*, 109 F.3d at 135 (finding summary judgment appropriate on Section 1981 and Title VII discriminatory discharge claims where plaintiff's "disputations [of his employer's proffered explanations] were rationalizations for his deficiencies rather than demonstrations of any genuine issue of material fact to be tried"); *Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 761 (8th Cir. 1998) (stating that "the relevant inquiry was whether [plaintiff] created a genuine issue of material fact as to whether her discharge was gender-based and not whether her termination was reasonable" and noting that "[i]t is not the task of this court to determine whether [the investigator's] investigation was sufficiently thorough or fair"); *Brown v. Soc'y for Seaman's Children*, 194 F. Supp. 2d 182, 191 (E.D.N.Y. 2002) ("[A]lthough plaintiff felt she had been treated unfairly, . . . [t]here simply is no basis in the record from which a rational juror could find that the reasons given for plaintiff's termination . . . were false or a pretext for discrimination."); *Ricks v. Conde Nast Publ'ns., Inc.*, 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000) ("The mere fact that an employee disagrees with her employer's assessments of her work . . . cannot[,] standing on its own[,] show that her employer's asserted reason[s] for termination [were] pretextual.") (internal citation omitted); *see also D'Cunha v. N.Y. Hosp. Med. Ctr. of Queens*, No. 02 Civ. 5445 (DLI), 2006 WL 544470, at *6 (E.D.N.Y. Mar. 6, 2006). An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984).[9]

In fact, in addition to Lavelanet (whom plaintiff accuses of "picking on" him), every manager who worked with plaintiff commented on his inability to perform his job satisfactorily despite having received adequate training. For instance, Scansarole worked with plaintiff during a two week training period from December 12 through December 23, 2005. In a letter to his manager, Scansarole commented that "with all the training [plaintiff] received [he] should be well up and running . . . At this point he is not, and I would not trust him to sit with customers

---

[9] In addition, although not a dispositive factor, any inference of discrimination is further undermined by the fact that plaintiff, who was sixty-five years old at the time of his hiring, was "well within the protected class when first hired." *O'Connor v. Viacom Inc.*, No. 93 Civ. 2399 (LMM), 1996 WL 194299, at *7 (S.D.N.Y. Apr. 23, 1996); *see James*, 76 F. Supp. 2d at 255; *Melnyk v. Adria Labs., Div. of Erbamont Inc.*, 799 F. Supp. 301, 319 (W.D.N.Y. 1992) ("[I]t is difficult to justify a conclusion of age discrimination when [the defendant] hired [the plaintiff] just one year prior to her entry into the protected class.").

to sell products and services correctly." (Lavelanet Aff. Exh. D.) Deevy also stated that "[i]n all my years as an Assistant Branch Manager and Branch Manager, I have never worked with an employee who had as much difficulty using the computers as did Mr. Kalra." (Deevy Aff. ¶ 7.) Moreover, Branca stated that he "recall[s] making a comment to Ms. Lavelanet that if Mr. Kalra had been tested following his Platform Orientation, [he] believe[s] that he would have failed . . . [he] would have serious doubts about keeping that employee at HSBC." (Branca Aff. ¶¶ 16-17.) Nowhere in plaintiff's papers does he claim that these individuals were similarly picking on him in a discriminatory manner and there is certainly no evidence that any of the individuals were motivated by age discrimination.[10]

Moreover, in arguing that plaintiff was treated differently because of his age, plaintiff focuses heavily on comparisons of his job performance to his younger co-workers. For instance, he testified that "[Lavelanet] just thought hey, he is an older man. I can pick on him. She was trying to compare me with Jennifer Watts who was perhaps the best worker in Chase Manhattan Bank. She was comparing my performance in the back of her head." (Kalra Dep., at 114.) Plaintiff also contends that he "was 65 at the time and all other employees were younger to Plaintiff and [Lavelanet] is comparing Plaintiff's 'performance' with other younger employee[s]" and that "Ms. Alex is comparing Plaintiff's 'performance' with Tom, who was under the age of 25, a younger employee" (Pl.'s Opp., at 9.) Plaintiff is essentially arguing that defendant treated him differently than younger employees because of his age (*i.e.*, terminated him), yet also argues that defendant erred by comparing plaintiff's performance to that of younger employees. Although the ADEA is a shield to protect employees from unlawful discrimination based on age, it cannot be used as a sword by plaintiff to excuse his performance well below the level required of all HSBC employees, young and old, and does not immunize him from termination for poor performance. *See, e.g., Parcinski v. Outlet Co.*, 673 F.2d 34, 37 (2d Cir. 1982) ("ADEA does not require an employer to accord special treatment to employees over forty years of age . . . It requires, instead, that an employee's age be treated in a neutral fashion."). Thus, there is no legal basis for plaintiff's contention that his performance should be compared only to workers who are of the same age and that it was discrimination to do so.

To the extent that plaintiff argues he was treated differently than similarly situated employees, the Court finds that argument to be similarly unavailing. (*See, e.g.*, Pl.'s Opp., at 9 ("[Lavelanet] was keen and interested to bring on board Ms. Jennifer Watts and Ms. Indira Das, younger employees from her previous Job at JP Morgan Chase and these people were younger to plaintiff.").) It is well settled that a plaintiff can raise an inference of discrimination by showing disparate treatment – namely, that a similarly situated employee

---

[10] Although plaintiff dismisses these affidavits by arguing that the HSBC witnesses are lying or are biased, these arguments are merely self-serving conclusory allegations that are insufficient to show pretext. *See Mincey v. Univ. of Rochester*, No. 06-5227-cv, 2008 U.S. App. LEXIS 1249, at *6 (2d Cir. Jan. 23, 2008) (granting summary judgment where plaintiff "conclusorily alleged that the witness . . . was biased against her" but "offered no evidence that the investigation was improperly conducted for the purpose of providing a pretextual explanation for an otherwise discriminatory termination"); *see also Holt*, 95 F.3d at 130 (holding that the assertion of personal beliefs is insufficient to show pretext).

outside the protected group received more favorable treatment. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003); *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). The law does not require the employees to be similarly situated in all respects, but rather requires that they be similarly situated in all *material* respects. *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ("A plaintiff is not obligated to show disparate treatment of an *identically* situated employee."); *accord Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997). The Second Circuit has further defined what the term "all material respects" means in this context:

> What constitutes "all material respects" . . . varies somewhat from case to case and, as we recognized in *Norville,* must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness . . . . Hence, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical . . . . The determination that two acts are of comparable seriousness requires – in addition to an examination of the acts – an examination of the context and surrounding circumstances in which those acts are evaluated.

*Graham v. Long Island R.R.*, 230 F.3d 34, 40-41 (2d Cir. 2000) (citations and quotations omitted).

As a threshold matter, with respect to the younger HSBC employees, there is no evidence that such employees were similarly situated. *See Cramer v. Pyzowski*, No. 04 CV 1122 (SLT) (SMG), 2007 U.S. Dist. LEXIS 38375, at *22-*23 (E.D.N.Y. May 25, 2007) (rejecting plaintiff's claim of disparate treatment where co-workers were not shown to have sub-standard work performance). Not only were these co-workers not performing poorly, but plaintiff suggests that they were better performers than he. (Pl.'s Opp., at 3 ("In the opinion of Ms. Alex, Ms. Watts was a very good and talented performer and such a role model employee for job performance comparison purposes of any employee young or old . . . This shows Ms. Alex's attitude for job performance comparison of her employees young and old and Plaintiff's job performance and older employee was compared with a younger employee . . .").)[11]

Moreover, plaintiff has set forth no evidence to suggest that Lavelanet replaced plaintiff with these younger individuals. First, Lavelanet stated that HSBC never filled plaintiff's position as a Consumer Banker after he was terminated. (Lavelanet Aff. ¶ 69.) Plaintiff has not provided any evidence to dispute this fact. Second, it is undisputed that both Jennifer Watts and Indira Das were interviewed for a Personal Banker position, not a Consumer Banker position (which was plaintiff's position). (*See* Defs.' Exh. C.) Third, defendant provided evidence that the Personal Banker position was available at the time the Rockville Centre Branch first opened

---

[11] In fact, plaintiff conceded in his deposition that one employee who he believed was under 35 years old ("Mr. Tom") either resigned or was forced to resign because of poor performance. (Kalra Dep. at 76-77.)

15

– a time well before plaintiff was fired. (*Id.*) Watts applied for the position in November 2005 but turned down the offer. (Lavelanet Aff. ¶ 66.) She eventually took a job with HSBC at the Hewlett Branch (not Rockville Centre) in June 2007. (*Id.*) Das applied for the Personal Banker position after Watts turned it down, accepted her offer on December 16, 2005, and began working for HSBC after plaintiff was terminated. (*Id.* ¶ 68.) Plaintiff has submitted no evidence to dispute these facts or to support his arguments that he was replaced by younger individuals. Thus, no rational jury could infer discriminatory animus based on purely speculative conclusions with no evidentiary support.

Finally, plaintiff's contention that HSBC's decision not to offer him a different position as a Safe Deposit attendant evidences discriminatory intent is also meritless. Defendant was under no obligation to provide plaintiff with another position after terminating him for performance and behavioral issues. *See, e.g., Campbell v. Daytop Vill., Inc.*, No. 97 Civ. 4362 (JSM), 1999 U.S. Dist. LEXIS 6943, *6-*7 (S.D.N.Y. 1999) ("A company need not reassign a terminated employee to a lower-paying job even if the terminated employee is qualified for the position.").

Plaintiff's arguments raise issues, if at all, only as to the accuracy or the wisdom of HSBC's decision to terminate plaintiff, but fail to create a triable issue as to whether HSBC's proffered reasons were a pretext for discrimination. However, because federal anti-discrimination law "may not be used as a vehicle for second-guessing an employer's business judgment," the Court finds that plaintiff's arguments fail to provide any basis for a reasonable jury to infer that HSBC discriminated against plaintiff on the basis of his age. *See, e.g., Brown*, 194 F. Supp. 2d at 191; *see also Argueta v. N. Shore Long Island Jewish Health Sys., Inc.*, No. 01 Civ. 4031 (JG), 2003 WL 22670915, at *9 (E.D.N.Y. Nov. 6, 2003) ("It is not the province of this Court, however, to second-guess the nondis[c]riminatory business decisions of private employers.").

In sum, considering the evidence as a whole, and viewing all the evidence in the light most favorable to plaintiff, no reasonable jury could find that plaintiff was terminated because of his age. Although plaintiff has offered several arguments to defeat summary judgment, "their combined weight is negligible, and no disputed material issues of fact remain." *Pisana v. Merrill Lynch & Co.*, No. 93 Civ. 4541 (LMM), 1995 U.S. Dist. LEXIS 10296, at *29 (S.D.N.Y. July 20, 1995) (granting summary judgment as to ADEA claim). Plaintiff has put forth no evidence, other than his age, from which discrimination could be inferred. That single fact is countered by the undisputed, overwhelming evidence weighing against plaintiff's allegations – namely, that plaintiff was hired when he was sixty-five years old and was terminated within four months after numerous incidents and complaints from multiple employees regarding his poor performance. Thus, in light of the single fact offered in support of plaintiff's claims – that is, plaintiff's age – and the overwhelming evidence weighing against an inference of discriminatory intent, no reasonable jury could find that plaintiff was fired because of his age. Indeed, the only reasonable conclusion is that plaintiff was fired based on his job performance. The Court recognizes that it must proceed with great caution in granting summary judgment in discrimination cases where intent, as drawn from inferences, is a core issue. However, as the Second Circuit has noted, "[t]o allow a party to defeat a

motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all [discrimination] cases." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). That is precisely the situation here. Plaintiff relies on pure speculation and has not produced sufficient evidence to support a rational finding that, more likely than not, plaintiff's age was the real reason for the termination. Accordingly, the Court finds that plaintiff has failed to raise a genuine question of fact as to his ADEA claim and grants defendant's motion for summary judgment.[12]

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED in its entirety. The Clerk of the Court is directed to enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: July 25, 2008
Central Islip, NY

\* \* \*

Plaintiff is proceeding *pro se*. The attorney for the defendant is Meredith Leigh Friedman, Esq., HSBC Bank USA, National Association, 425 Fifth Avenue, 7th Floor, New York, NY 10018.

---

[12] Although plaintiff did not allege retaliation in his complaint, he suggests in his opposition papers that he was the victim of retaliation based upon his response to the IJD in which he claimed discrimination. To the extent that plaintiff is now attempting to allege retaliation, such claim also cannot survive summary judgment. Title VII prohibits an employer from firing an employee in retaliation for having made a charge of discrimination. 42 U.S.C. § 2000e-3(a); *see also* N.Y. Exec. Law § 296(1)(e); N.Y.C. Admin. Code § 8-107(7). "Title VII is violated when 'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.'" *Terry v. Ashcroft*, 336 F.3d 128, 140-41 (2d Cir. 2003) (internal citations omitted). To establish a *prima facie* case of retaliation, a plaintiff must show (1) he engaged in a protected activity; (2) defendant was aware of that activity; (3) he suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 66 (2d Cir. 1998); *see Terry*, 336 F.3d at 141. Retaliation claims are governed by the burden-shifting framework set out by the Supreme Court in *McDonnell Douglas*. *Terry*, 336 F.3d at 141 (2d Cir. 2003). Even assuming *arguendo* that plaintiff had succeeded in making a *prima facie* showing of retaliation under *McDonnell Douglas*, the defendant has set forth a legitimate, non-discriminatory reason for terminating plaintiff: his poor performance. Plaintiff has proffered no evidence from which a reasonable jury could conclude that the articulated reason was pretext and that he was terminated in retaliation for claiming discrimination in connection with his response to the IJD. Instead, plaintiff offers nothing more than conclusory allegations in his opposition papers – with no basis in the record – that he was retaliated against and, thus, he can point to no evidence that creates a genuine issue of material fact for trial. Accordingly, to the extent that plaintiff is also now alleging a retaliation claim, summary judgment on that claim in defendant's favor is also warranted.

17